An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-210

Filed 5 November 2025

Cabarrus County, No. 23JT000126-120

IN THE MATTER OF:
E.J.B.

Appeal by Respondent from order entered 5 November 2024 by Judge Michael G. Knox in Cabarrus County District Court. Heard in the Court of Appeals 25 September 2025.

*Parent Defender Wendy C. Sotolongo, by Assistant Parent Defender Jacky L. Brammer, for Respondent–Appellant Mother.*

*Hartsell & Williams, PA, by Attorney Emily J. Arnold, for Petitioner–Appellee Cabarrus County Department of Social Services.*

*N.C. Administrative Office of the Courts, by Attorney Matthew D. Wunsche, for Appellee Guardian ad litem.*

MURRY, Judge.

Respondent Melissa J. Ritchie (Mother) appeals from an order terminating her parental rights to her minor child, E.J.B. (Elizabeth).[1] For the reasons discussed

---

[1] In accordance with North Carolina Rule of Appellate Procedure 42, we refer to the minor child by a pseudonym to protect her identity. *See* N.C. R. App. P. 42(b).

below, this Court affirms the trial court's order terminating Mother's parental rights.

## I.    Background

On 5 June 2023, the Cabarrus County Department of Human Services (DHS) filed a juvenile petition alleging that Elizabeth, then-11 years old, was neglected and dependent as defined by N.C.G.S. § 7B-101(9), (15). The petition stated that DHS received a child protective services (CPS) report that same day alleging "sexual abuse and neglect" based on substance abuse and an injurious environment. The report documented Elizabeth's family history of CPS involvement since 2014, including allegations of substance use, improper care, substandard medical care, and an injurious environment. The report alleged that Elizabeth had not attended school since kindergarten and that her parents claimed to homeschool her but were "incapable" of doing so. The report alleged that Elizabeth was exposed to pornography, was severely overweight without receiving medical care, and witnessed domestic violence between her parents in the home.

DHS made an unannounced visit to the home the same day it filed the petition. The CPS report contained Elizabeth's statements that her parents used "white powder" daily and had fights in which they "break things," that she watched pornography in her room every day for at least five minutes, and that her parents did not check her tablet or supervise her. Mother admitted to snorting heroin every day and not knowing the last time she checked Elizabeth's browser history or supervised her tablet use. Although Mother claimed to homeschool Elizabeth, she could provide

no school records for her. She claimed that Elizabeth was last seen at her primary care doctor "approximately a year ago." Following the visit, DHS concluded that Elizabeth's parents could not "provide for . . . [her] care or supervision and lack[ed] an appropriate alternative child-care arrangement." After a hearing the next day, DHS placed Elizabeth in nonsecure custody.

On 13 July 2023, the trial court adjudicated Elizabeth neglected and dependent following a hearing. The trial court ordered Mother to follow a DHS case plan to remedy the issues leading to Elizabeth's removal. The case plan required Mother to complete a psychological and parenting capacity evaluation, an approved parenting course, a substance-abuse assessment, and to follow any resulting recommendations and treatment. It also required Mother to attend Elizabeth's medical and dental appointments, complete random drug screens, complete a domestic violence assessment, and maintain suitable housing and sufficient income to support Elizabeth. The case plan required Mother to comply with a visitation plan administered by an assigned DHS social worker.

After a subsequent hearing on 12 October 2023, the trial court found that Mother had "made little progress" on the case plan. Although she completed her parenting and substance-abuse evaluations, she did not complete the accompanying parenting classes and drug treatment. Mother did not complete the psychological evaluation, attend Elizabeth's medical appointments, or seek employment. Additionally, Mother continued to test positive for fentanyl, marijuana, cocaine, and

methamphetamines on multiple occasions. Following a permanency planning hearing on 21 March 2024, the trial court found that Mother continued to make "insufficient" progress on her case plan and changed Elizabeth's permanent plan from reunification to adoption with a secondary goal of reunification.

On 28 May 2024, DHS moved to terminate Mother's parental rights under N.C.G.S. § 7B-1103. At the termination hearing on 1 October 2024, the DHS social worker testified that Mother had made "little to no progress" on her case plan and "[s]ometimes" "engaged [Elizabeth] about her education" but "not very often." She testified that Mother only "sometimes" asked Elizabeth about her school, grades, and classes during visitation. Elizabeth herself testified that during phone calls with Mother, they talked about "what's going on in [Mother's] house" and "what's go[ing] on in [Elizabeth's] school." When Mother's attorney asked Elizabeth whether Mother asked her about school, Elizabeth responded, "Usually I'll bring it up." He then asked her if Mother "carr[ies] on the conversation and ask[s] about the school," to which Elizabeth responded, "No," that Mother will "usually" just say, "Oh, that's cool."

The social worker testified that Mother failed to attend Elizabeth's pre-surgery consultation for gallstones; whereas Elizabeth testified that "[Mother] came to [her] doctor's appointment" where Elizabeth "talk[ed] to [her] doctor about" her gallstones. At the hearing, Elizabeth described her relationship with Mother as "basically like a mother and daughter relationship" and affirmed that she felt affection towards Mother. The social worker described Mother and Elizabeth's relationship as "very

loving . . . but it does seem to be more . . . on a friendly basis." When asked whether the bond between Mother and Elizabeth was "just . . . an outward demonstration of affection," she responded, "Yes." The social worker also testified to Elizabeth's "bond" with her foster parents and her "enjoy[ment of] being in [their] home," "help[ing] out with the younger kids," and "help[ing] her [foster mom] cook." Elizabeth herself testified to having a "good" relationship with her foster parents, stating that they cared for her daily needs and discussed her medical appointments. Elizabeth affirmed that she "kn[ew] that the foster parents w[ould] be there for [her]."

The trial court sustained DHS's objection to Mother's counsel asking Elizabeth whether she would want her current foster parents to adopt her. Mother's counsel then asked Elizabeth what she "would . . . like to see happen" after the hearing. Elizabeth responded that she wanted to "go home" with Mother. In contrast, the social worker testified that, based on their prior conversations, Elizabeth "understands adoption" and "would like to be adopted." The guardian *ad litem* (GAL) supervisor similarly testified that Elizabeth "wants to have a future" and a "stable" home. While he acknowledged the bond between Mother and Elizabeth, he concluded that Elizabeth's "adopt[ion] in a home where she can grow and thrive" would be in her best interest. The GAL report, entered into evidence, states that Elizabeth "understands that her parents have work to do and wishes that they c[ould] be a family unit again."

Following the hearing, the trial court terminated Mother's parental rights in November 2024 on grounds of neglect and dependency under N.C.G.S. § 7B-1111

(termination order). *See* N.C.G.S. § 7B-1111(a)(1), (6) (2025). In its termination order, the trial court made certain findings of fact (FoF):

34.    Mother attended all but one visit during the last reporting period. She has to be reminded to not bring Elizabeth junk food concerning her weight and to not discuss the case with Elizabeth but instead to ask her about school, friends, and what she has been doing.
. . . .

56.    On 21 March 2024, the trial court found that adoption is in Elizabeth's best interest and that a termination-of-parental-rights action should be filed.

57.    Terminating Mother's parental rights would aid in the accomplishment of Elizabeth's permanent plan of adoption. There is a bond between Elizabeth and her mother; however, it is not a parental bond but more of a friendship bond.
    Mother does not show redirection or ask parental questions to Elizabeth about school or her health. Mother did not attend Elizabeth's pre-surgery or surgery for gallstones and could not tell you what her favorite [school] subject is or who her best friend is.

[58.]    Elizabeth feels like she is a part of her foster family's home by helping with chores, playing with the animals, and assisting the foster mother.[2]

(Quotation modified.) The termination order made no specific finding regarding Elizabeth's wishes but concluded that termination of Mother's parental rights and a permanent plan of adoption would be in Elizabeth's best interests. Mother timely appealed.

## II.    Jurisdiction

---

[2] The termination order mistakenly numbers the finding of fact (FoF) immediately following #57 as #64. We refer to it as FoF #58 throughout this opinion, as does Mother in her brief to this Court.

Under N.C.G.S. § 7B-1001, this Court has jurisdiction to hear Mother's appeal because it concerns an "order that terminates [her] parental rights." N.C.G.S. § 7B-1001(a)(7) (2025).

## III.    Analysis

On appeal, Mother claims the trial court abused its discretion by terminating her parental rights to Elizabeth because it (1) made unsupported findings regarding Mother's knowledge of and involvement in Elizabeth's life, (2) failed to include findings about Elizabeth's preferences regarding adoption, and (3) abused its discretion according to a totality of the circumstances. Mother also argues that the GAL program did not convey Elizabeth's wishes to the trial court as statutorily required.

A termination-of-parental-rights proceeding has two stages: adjudication and disposition. *In re S.D.H.*, 296 N.C. App. 392, 398 (2024); *see* N.C.G.S. §§ 7B-1109, -1110 (2025). At the adjudication stage, the trial court need only find "one ground" for termination under § 7B-1111 to "support a termination of parental rights." *In re A.R.A.*, 373 N.C. 190, 194 (2019). If the trial court determines that one or more grounds for termination exist under § 7B-1111, it proceeds to the dispositional stage to determine whether termination of parental rights would be in the child's "best interest." *In re M.A.*, 374 N.C. 885, 868 (2020). Here, the trial court found grounds for termination of Mother's parental rights under both neglect and dependency at the adjudication stage. *See* N.C.G.S. § 7B-1111(a)(1) (neglect); *id.*

§ 7B-1111(a)(6) (dependency). Because Mother does not challenge the adjudicational portion of the trial court's termination order, we consider only the dispositional portion.

This Court reviews an order for termination of parental rights to determine whether "clear, cogent, and convincing evidence" supports the trial court's findings of fact. *In re E.H.P.*, 372 N.C. 388, 392 (2019). If such evidence exists, the findings of fact are "conclusive even if the record contains evidence that would support a contrary finding." *In re S.R.*, 384 N.C. 516, 520 (2023). Unchallenged "findings of fact . . . are binding on appeal." *In re G.B.,* 377 N.C. 106, 111 (2021). We review the trial court's conclusions of law *de novo* to determine whether they are supported by the findings of fact. *See S.R.*, 384 N.C. at 520. Once the trial court adjudicates grounds for termination, the decision to terminate parental rights at disposition is reviewed only for an abuse of discretion. *See In re C.V.D.C.*, 374 N.C. 525, 528–29 (2020). A trial court abuses its discretion when its ruling is "so arbitrary that it could not have been the result of a reasoned decision." *In re N.G.*, 186 N.C. App. 1, 10–11 (2007) (quotation omitted). For the reasons below, this Court holds the trial court did not abuse its discretion by terminating Mother's parental rights to Elizabeth.

**A. Challenged Findings**

Mother challenges FoFs#34 and #56–#58 as "false and unsupported" by the evidence. We largely disagree on all counts.

### 1. *Finding No. 34*

First, Mother argues the evidence does not support FoF #34 that she had to be reminded to ask Elizabeth about her school, friends, and activities. At the hearing, both the social worker and Elizabeth testified that Mother only "sometimes" engaged with her about school and that Elizabeth largely initiated school-related conversation without much response. Their testimonies support the trial court's finding that Mother needed reminders to engage Elizabeth regarding her schoolwork and day-to-day activities. The trial court appropriately weighed the evidence in finding Mother's lack of engagement with Elizabeth about school and other activities. Thus, we hold the trial court did not err by making FoF #34.

### 2. *Finding No. 56*

Mother claims the trial court erred in making FoF #56 because it "disregarded how reunification remained part of [Elizabeth's] permanent plan" and how termination of Mother's parental rights would "eliminate . . . reunification as a permanent plan." In FoF #56, the trial court references its earlier order changing Elizabeth's primary plan from reunification to "adoption with a secondary goal of reunification." The trial court did not mention reunification in its reference to the earlier order. But its uncontested findings found grounds to terminate Mother's parental rights under neglect and dependency. *See* N.C.G.S. § 7B-1111(a)(1) (neglect); § 7B-1111(a)(6) (dependency). Because termination would eliminate the possibility of reunification, we logically infer that the trial court's termination of Mother's parental

rights eliminated reunification as a secondary plan. Thus, the trial court appropriately made no findings regarding reunification specifically.[3]

### *3. Finding No. 57*

Mother claims the trial court erred in making FoF #57 that the bond between Mother and Elizabeth was less "a parental bond" than it was "a friendship bond." She believes the trial court erroneously "accepted" the DHS social worker's "characterization of the bond as a 'friendship' " over Elizabeth's own contradictory testimony. It is true that the social worker's testimony of Mother and Elizabeth's merely "friendly" relationship differs from Elizabeth's testimony of their mother–daughter relationship. But the trial court made other, uncontested findings showing Mother's lack of parental responsibility: Mother was "incapable of providing for . . . [Elizabeth's] proper care and supervision," made no "noticeable change" in parenting behaviors, and ultimately "abdicated [her] parental responsibilities." The trial court appropriately weighed the evidence in finding the nature of Mother and Elizabeth's relationship. Thus, we hold the trial court did not err by finding that Mother and

---

[3]    Mother similarly claims that FoF #57 is unsupported "[t]o the extent [it] omits discussion of the impact of termination on Elizabeth's concurrent plan of reunification." She cites N.C.G.S. § 7B-1110 to argue that the trial court should have made findings on termination's "effect . . . on a plan of reunification." *See* N.C.G.S. § 7B-1110(a)(3) (Trial court must consider whether termination "will aid in . . . accomplish[ing the child's] . . . permanent plan"). Because Mother offers no authority to support her assertion that § 7B-1110 requires the trial court's order to address the secondary plan, we dismiss her argument on this ground. *See In re S.M.*, 380 N.C. 788 (2022) (holding that trial court was not required to make written findings regarding secondary plan of guardianship).

Elizabeth's relationship was "more of a friendship bond" than a parent–child relationship.

Mother also challenges the portion of FoF #57 finding her non-attendance at Elizabeth's pre-surgery consultation and lack of knowledge regarding Elizabeth's favorite school subject or best friend. Mother claims she did attend the pre-surgery consultation and that no testimony at the hearing addressed Elizabeth's best friend or favorite school subject. The social worker testified that Mother did not attend the pre-surgery consultation. Thus, the trial court based its finding on sufficient evidence. *See S.R.*, 384 N.C. at 520 (Supported findings of fact are "conclusive" despite evidence supporting a "contrary finding."). Accordingly, we hold the trial court did not err by documenting Mother's non-attendance in FoF #57.

Both Mother and Elizabeth testified about Elizabeth's friends, but neither testified with specificity as to who Elizabeth's best friend was. Elizabeth only testified that she spent time with her friends "[a]t school" and that "[t]hey're my friends basically, like we're best friends." As to her favorite school subject, Elizabeth testified she was working on math and reading but did not identify a favorite subject. Mother was not asked about Elizabeth's favorite subject. No other competent evidence at the hearing addressed these two facts. Thus, we agree with Mother that the evidence did not support the portion of FoF #57 that she did not know Elizabeth's favorite school subject or best friend.

### 4. *Finding No. 58*

Finally, Mother claims the trial court erred in making FoF #58 that Elizabeth "feels like she is a part of [her] foster family's home." She argues that, "while Elizabeth characterized her bond with her foster family as simply 'good,' the [trial] court bootstrapped this language into Elizabeth feeling [like] 'part of [their] . . . home.'" The social worker testified to Elizabeth's bond with her foster parents and her enjoyment of day-to-day life in their home, and Elizabeth testified to her assurance of their care for her. In light of this testimony, the trial court appropriately weighed the evidence in determining the strength of Elizabeth's relationship with her foster family. Thus, we hold the trial court did not err by finding Elizabeth's integration into her foster family's home in FoF #58. For the above reasons, we hold that the trial court did not err as to FoFs #34, #56, and #58; but that it did err in the portion of FoF #57 addressing Elizabeth's best friend and favorite school subject.

## B. Child's Preferences

Next, Mother argues that the trial court abused its discretion by failing to include Elizabeth's wishes in its findings. **{Mother's Br p 20}** She claims that, because Elizabeth's testimony conflicted with the social worker and GAL's testimonies that Elizabeth wanted to be adopted, the trial court "had an obligation" to make written findings of fact on Elizabeth's wishes under N.C.G.S. § 7B-1110(a). **{Mother's Br pp 21-22}**

At the dispositional hearing, the trial court must "determine whether terminat[ion] is in the juvenile's best interest" based on "any evidence" it "finds to be

*Opinion of the Court*

relevant, reliable, and necessary." N.C.G.S. § 7B-1110(a). The trial court must consider certain statutory factors and "make written findings regarding [those] . . . that are relevant": (1) the child's "age," (2) the "likelihood of adoption," (3) whether termination will "aid in . . . accomplish[ing] . . . [the child's] permanent plan," (4) the parent–child bond, (5) the child's "quality of . . . relationship" with any "proposed . . . permanent placement," and (6) "any relevant consideration." *Id.* Our Supreme Court has clarified that, "[a]lthough the trial court must consider each of the factors in N.C.G.S. § 7B-1110(a), written findings of fact are required only if there is conflicting evidence concerning the factor, such that it is placed in issue by virtue of the evidence presented before the district court." *In re S.M.*, 380 N.C. 788, 791 (2022) (quotations omitted). We review the trial court's best-interests determination for abuse of discretion. *See C.V.D.C.,* 374 N.C. at 528–29.

Mother incorrectly cites *In re S.M.* to support her claim that, "[i]f the child is at least 12 years old and there is conflicting evidence about the child's wishes, the court must make findings resolving the conflict." In *S.M.*, our Supreme Court rejected the parents' argument that the trial court abused its discretion in a termination proceeding by failing to consider their child's wishes regarding adoption. *Id.* at 795. The trial court had sustained an objection for relevance to a question on a child's "feelings on adoption." *Id.* The *S.M.* Court reasoned that, although North Carolina's adoption statutes require a twelve-year-old child to consent to adoption, they also allow the trial court to waive the consent requirement upon finding that requiring

consent would not be in the child's best interest. *Id.* Thus, the Court concluded the trial court's ruling was "harmless" because any potential objection by the child "would not preclude her adoption." *Id.* at 796.

At the hearing, Elizabeth's own testimony differed from the social worker's testimony of Elizabeth's wishes based on their earlier conversations. But a child's preference regarding adoption is not one of the required statutory factors for consideration. *See* N.C.G.S. § 7B-1110(a); *M.A.*, 374 N.C. at 880 (holding that trial court was not required to make findings about the likelihood of the children's consent to adoption). Though a trial court may "consider" a child's preferences in determining her best interests, those preferences do "not control[ ]" because "the children's best interests constitute the 'polar star' of the North Carolina Juvenile Code." *M.A.*, 374 N.C. at 879 (quotation omitted). Thus, the trial court was not required to make written findings on Elizabeth's preference regarding adoption and did not abuse its discretion by declining to do so. The trial court appropriately weighed testimony from Elizabeth, DHS, and the GAL supervisor in making its final determination that adoption would be in Elizabeth's best interest. Thus, we hold that the trial court did not err by not including written findings regarding Elizabeth's preference.

Mother also asserts that the trial court reversibly erred when it "failed to require the GAL program to perform its statutory duties" because the "GAL program failed to effectively convey Elizabeth's express wishes to go home with her parents and not be adopted." She claims that the GAL supervisor failed to ensure that, "[e]ven

if the GAL cannot recommend what the child wants, the GAL should make sure the court *knows* what the child wants" and "[i]f the child does not inform the court of his or her wishes, someone must." (Quoting N.C. Admin. Off. Cts., GAL Attorney Manual 501, 511 (2007), https://www.nccourts.gov/documents/publications/guardian-ad-litem -gal-attorney-manual (last visited Oct. 28, 2025)). Elizabeth informed the trial court of her wishes at the hearing. The GAL was not required to reiterate her preferences. The GAL supervisor testified to Elizabeth's "strong bond" with Mother but recommended adoption to give Elizabeth needed stability and growth. In doing so, the GAL supervisor made an appropriate recommendation based on his assessment of Elizabeth's best interests. Thus, we affirm the trial court's compliance with the GAL program's statutory duties.

### C. Totality of the Circumstances

Next, Mother claims that, based on the totality of the circumstances, the trial court abused its discretion by terminating her parental rights. To support her claim, Mother reiterates her challenges to FoFs #57–#58 and her arguments regarding the trial court's lack of written findings regarding Elizabeth's preferences on adoption and the effect of termination on reunification. We do not revisit these previously addressed arguments.

Additionally, Mother claims the trial court failed to include in its best-interest analysis that Elizabeth had consistent visitation with Mother since the case began. On the contrary, FoF #34 documents Mother's visitation plan with Elizabeth and

states that Mother "attended all but one visit during the last reporting period." This finding shows that the trial court considered Mother's visitation in reaching its termination decision.

Finally, Mother claims that the trial court conducted a merely "cursory" analysis of the required best-interest factors under N.C.G.S. § 7B-1110(a). She believes that the trial court did not state whether Elizabeth's age "supported or weighed against termination," and that it made only a "rote reference" to Elizabeth's likelihood of adoption. We decline to substitute our weighing of the relevant statutory criteria for that of the trial court. *See In re I.N.C.*, 374 N.C. 542, 551 (2020) (reweighing evidence is "inconsistent" with abuse-of-discretion standard). Although N.C.G.S. § 7B-1110(a) requires the trial court to consider the child's age and likelihood of adoption, it requires no specific written findings on these or any other listed factor. *See* N.C.G.S. § 7B-1110(a)(1)–(2); *S.M.*, 380 N.C. at 791 ("The trial court's dispositional findings are binding if . . . supported by any competent evidence.").

Here, the trial court found that Elizabeth was "approximately 12 years old" at the time of the hearing and her permanent plan "remain[ed] adoption." The social worker testified to Elizabeth's "pretty high" likelihood of adoption and the GAL report stated "a likelihood that [Elizabeth] could be adopted." Far from an abuse of discretion, the trial court's findings reflect a thoughtful and "reasoned analysis"

weighing the factors based on the testimony and evidence before it. *In re Z.A.M.*, 374 N.C. 88, 101 (2020). Thus, we affirm the trial court's termination order.

## IV.    Conclusion

For the reasons discussed above, this Court holds that the trial court did not err by terminating Mother's parental rights to Elizabeth and thus affirms the termination order.

AFFIRMED.

Chief Judge DILLON and Judge ARROWOOD concur.

Report per Rule 30(e).